Go ahead. May it please the Court, my name is Brian Hurlbutt and I'm representing the Idaho Conservation League. I'd like to reserve five minutes for rebuttal. Okay, just keep your eye on the clock. Okay, thank you. At the heart of this case is BPA's decision to move forward with new winter operations at the Albany Falls Dam in North Idaho without fully studying likely environmental impacts first. The earlier NEPA documents prepared for the dam never studied shoreline erosion in detail and neither does the new flexible operations environmental assessment initiative. Is that going back to what they were doing before 2000, right? Starting in 1995, winter lake levels were held steady at the dam and under the new operations, winter lake levels would fluctuate up to three times every winter for the life of the dam. I thought they were fluctuating up until 2000. There was a time in the past when they were not. There was a time in the past when they were not held totally steady and there was some variation in winter lake levels. So essentially the agency here said, look, this is not different from what we're doing in the summer and this is not different from what we were doing in the past. So it's not sufficiently significant action to require an EIS. There is some similarity to what they're proposing to do now and what has been done in the past, but the key point is that they never studied in the past what the impacts were of the historical winter operations at the dam. The 1995 SOR EIS serves as sort of the basis of the analysis here. What do you think is your strongest argument? Sorry, what was that? You have raised a number of bases for challenging the agency's action. What's your strongest argument? Strongest... Sort of cut it down to one single argument. Sure. Not that you need to, I'm just saying, but what's your strongest argument? Yeah, shoreline erosion. Shoreline erosion is a serious problem around the reservoir that's above the dam, which includes Lake Pend Oreille, Idaho's largest natural lake. The EA itself admits that under the new operations, shoreline erosion is likely to increase over what's been happening when winter lake levels were steady. And in the EA, the EPA essentially abandons its initial plan to look at erosion in detail and essentially ignores Idaho Fish and Game's warnings that this increase in erosion could be significant. And if I could, I'd like to draw this Court's attention to ER 63. This is in the environmental assessment. We say in our briefing that the EA is cursory and that it rests on speculative assertions, and this is why. At the bottom of ER 63, this is the two-paragraph explanation of what's likely to happen with shoreline erosion above the Albany Falls Dam under the new winter operations. Note that earlier in the EA, there is some discussion about historical erosion losses, but these two paragraphs actually evaluate what will happen with shoreline erosion if winter lake levels are fluctuated instead of held steady. And in the first paragraph, after acknowledging that shoreline erosion could increase, it says, quote, the magnitude of this increase would vary widely depending on the shoreline substrate location and would require detailed surveys to quantify, end quote. And then in the second paragraph, after again acknowledging that shoreline erosion could increase, it says, quote, these increases are expected to be incremental relative to the rate of erosion that occurs throughout the year, particularly in summer, end quote. And that's the end of the analysis. But why does BPA expect that shoreline erosion will only increase incrementally? What's that based on? And why didn't BPA go out and do the surveys that would have allowed them to evaluate how much increase in erosion might be? And so our best argument, I think, is that that's exactly the kind of conclusory statement and failure to go out and gather data that renders environmental assessments inadequate. How is winter erosion different from the rest of the seasons? I mean, they do fluctuate the level of the lake the rest of the year, right? Right. Sorry, and what was the start of your question? How is the winter fluctuation different from the rest of the year? So just to explain kind of how it works, in the spring the lake fills up and by the summer it reaches a really high level, and it's held at that high level all summer, drawn down in the fall to some winter low level, and then since 1995 held at that level, and now fluctuate up to three times over a five-foot range. So this is when the lake is at its lowest level? When it's at its lowest level, right. So it wouldn't be coming up to the same height that it does in the summer. I see. And so the erosion processes and impacts could be sort of different than what's happening during the summer, but it's pretty well documented in the record that by fluctuating lake levels and re-saturating soils and then drawing the water back down, that that can trigger a number of different erosion processes. You know, you read parts of their paragraph. Didn't the close of that section say that the erosion would not be above the levels already described in the prior EIS, and therefore they didn't think it would be necessary to do a new one? That's right, Your Honor. That's what it says. And the big problem with that is that the 1995 SOR EIS, it doesn't actually study erosion in detail. It doesn't tell you what to expect under different operations. It does say that Idaho Fish and Game estimated in the 1980s that every year 30 more acres of land are eroding into Lake Pend Oreille. But it doesn't explain sort of where around the 226-mile shoreline that's happening. It doesn't explain how if you were to change the dam's operations, what the different impacts might be. That 1995 SOR EIS was a programmatic EIS that looked at the combined operations of 14 different dams, including the Albany Falls Dam. It had a very limited analysis of what was going on at the dam with respect to erosion, and that may have been fully appropriate for a programmatic EIS. But now that we're actually looking at a change to the Albany Falls Dam, if you look at the 1995 EIS, it doesn't really shed much light on what to expect under different operations. Do I understand Brownville to be saying that while the proposal would permit three fluctuations, they really don't think they'll ever do more than one? They do say that they sort of analyzed the maximum scenario and that they think that it's unlikely that that would happen most years. Is that entitled to any weight? Well, we think that the record shows that even if they don't do three full fluctuations every winter, still by doing some fluctuations, whether it's one full fluctuation every winter or three smaller fluctuations or some other way of doing it, that that would still potentially have significant impacts that haven't been studied. And I think it's important to look to the history of the adoption of these new fluctuations. In 2009, when BPA first proposed winter fluctuations, they proposed doing a one-year experiment that was going to be closely monitored, and any decision to continue with the winter fluctuations would depend on the results of that monitoring and what the impacts were. Just that initial proposal generated widespread concerns that the impacts weren't understood of doing this and that just doing it this one year could be a big deal. The Army Corps agreed that it wasn't well understood and needed to be studied further, and so the Army Corps denied BPA's original request to do this and decided to prepare the environmental assessment. But somehow by the time the environmental assessment came out, the plan had morphed from this one-year closely monitored experiment, under which impacts were largely unknown, to the EA that now concludes that the impacts are well understood, even though the agencies never included in the EA key baseline information that they had planned to gather while they were preparing the EA. If we were to agree with you in whole or in part, can they fix the EA without doing the complete EIS? Possibly. If you were to reverse and set aside the EA, if you felt like the record did show that an EIS is required, this court could order that. Alternatively, the EA could be remanded to the agency to fix any flaws, and it could be left up to the agency to determine whether it would require an EIS or just a new EA. I'm sorry, how exactly would they fix the EA? Well, if I understand correctly, your objection is that there are no studies. And can you do a study to support an EA? I thought the whole idea of having an EIS is that if you're going to do studies, you need an EIS.  I'm just saying. Yeah, yeah. I guess it depends on sort of what the flaws are with the EA. If the idea is. Well, I think the question was this particular flaw that you've been focusing on. Sure. That's what I understood the question to be. Your argument up to now, and I realize there are other problems you have with the EA, but we've been focusing on the shoreline erosion problem. And I think Judge Davis was asking, can they fix this problem by just amending the EA or doing a new EA, or would it require an EIS? If this Court held that the EA failed to take a hard look at erosion, BPA could, through a supplemental EA or a new EA, undertake more detailed erosion analyses. And if they did that, that might show satisfactorily that erosion would not increase significantly, and therefore they could use an EA to correct the problem. If this Court found that the record supports that shoreline erosion may be significant and that they need to prepare an EIS, then sure, they need to prepare an EIS. And we think that the Idaho Fish and Games comments help show that shoreline erosion may be significant and that an EIS should be prepared. You'd be back here on a supplemental EA, I take it. It depends on what it says. It depends on what analysis the agency undertakes and what it shows and how they present it. And if our clients felt convinced that they did take a hard look at all the impacts and that they had the convincing statement of reasons that NEPA requires as to why an EIS is not necessary, then that can be fine. I'd like to address BPA's reliance on the Upper Snake River case to suggest that NEPA doesn't even apply here. First, I'd like to point out that I don't think we're even in the land of Upper Snake River here, because the ongoing operations of the Albany Falls Dam is already a major federal action that's been subjected to NEPA. That's why the Corps prepared an EIS in 1983 for the dam's operations, and that's why Bonneville, the Corps, and the Bureau of Reclamation prepared the 1995 EIS. Once an agency undertakes a major federal action, they have a continuing duty to comply with NEPA and to prepare a supplemental environmental impact statement any time there may be new significant impacts that weren't disclosed before. And so BPA knows this, and that's the stated purpose of the EA. At the beginning of the EA in the Purpose and Needs section, they say they're looking at the new flexible operations and seeing if there's any significant new impacts. They say that in conclusion. They say it multiple places in between. And only valid litigation are they arguing that somehow the dam's operations aren't subject to NEPA. But even if you look just at the flexible operations under the Upper Snake River case, the flexible operations themselves would qualify as a major federal action under NEPA. Upper Snake River involved a dam that was routinely being managed as it had from the outset without change, and that's not the situation here. The new flexible operations are a change in the way the dam's being managed. Right now, winter lake levels are steady. Under the flexible operations, it would go up and down three times every winter. And it's important to note that the dam was built in 1955, which is a long time ago, and a lot's changed since then. It seems like a long time ago. It seems like a long time ago. Some of us remember 1955. Finally. Go ahead. But anyway, a lot's already changed since then, and BPA can't really go back now to some earlier time where they're just continuing to operate the dam as they were from the outset. And I will save my five minutes unless you have further questions. Thank you. Thank you. Okay. We'll hear from the government. Thank you, Your Honor. May it please the Court, my name is Hub Adams, and I represent the Bonneville Power Administration. This morning I'd like to touch on three main aspects of this case. First, the flexible operations EA that we prepared demonstrates that Bonneville did indeed take a hard look under NEPA at potential environmental impacts, including those raised by petitioner that are associated with this operation. Second, preparation of an EA for this operation rather than EIS was entirely reasonable given the circumstances, and this approach comports with both NEPA regulations and case law. Third, the record shows that this operation is an extremely minor activity in the overall context of lake operations with only negligible impacts, particularly with the many mitigation measures Bonneville has built into it. All that said, Bonneville is still taking other substantive measures to address head-on the broader concerns it heard during the process about impacts from overall lake operations. In short, the environmental process in this case worked exactly as it should. Practically speaking, flexible operations is simply a reversion back to a long-standing historic winter operation within the authorized operating range of Albany Falls Dam. This dam is an important part of the federal Columbia River hydro power generation system. Given its location and the fact that it is one of only two dams in this system where water can be stored in the winter for power production. Better utilizing nearly up to five feet of this 1,200-foot deep lake when opportunity presents itself within only a 12- to 14-week window in wintertime. I'm sorry, five vertical feet? Yes, Your Honor, five vertical feet. So the level of the dam sinks, oh, I'm sorry, the level of the lake sinks five feet. I don't know my math as well as that, but depending on how steep the lake is, five feet drop in the level of the lake can affect a lot of shoreline. That's correct, Your Honor. If you have a sort of fairly gentle slope drop, I think Judge Fernandez knows the math. He's much better at this stuff than I am, but it's like a triangle, right? So if the angle is acute, we're talking about a lot of shoreline here, right? It could be. It's very variable. It depends because the reservoir is basically the dam has. The point is you don't know, right? It hasn't been studied. We have reasonably. Just guessing. Your Honor, I think the record shows that we have reasonably relied on previous studies that have been done, including the programmatic EIS that was prepared and additional studies that were done subsequent to that, to talk about. You heard opposing counsel's objection to the programmatic study. It was done a long time ago, and it was in the context of a lot of other entire system, which comprises a lot of other things. And his claim is that it didn't really study erosion at all. Is that a fair assessment? I don't think it is, Your Honor. I think basically that the analysis that was done as part of that EIS remains true today. The dynamics, the erosional effects are still the same that were occurring at that time. And as our brief and as the EA explains, the primary problem with erosion is in the summertime rather than the wintertime. And that's why studies subsequent to the EIS had borne that out. That's why what was done for the purposes of this environmental review of an operation that really, on the grand scheme of things, is very minor, the level of analysis that was done was completely appropriate. How do we know it's minor? I mean, you know, opposing counsel paints a different picture. He says, look, there's fluctuations in the summer when the water level is high, so you're affecting shoreline way out here. But when the water level is low, the entire lake contracts, and now you're dealing with area that in the winter, if you fluctuate the level, that is never exposed otherwise. You're now exposing parts of the lake bed that isn't exposed. And he talks about erosion. He talks about the invasive species that take over. You know, how do we know? Where is all this stuff studied? If I wanted to delve in these things and find a nice discussion of shoreline erosion or invasive species, where would I find them? I think, Your Honor, as we've referenced, it's largely in the EIS in its appendix that covers geology. I actually meant a volume and page number. What I meant is where do I look to find this? There's information. If I may cite to the supplemental excerpts of the record, would that be sufficient? You can cite to anything that's in the record. All right. Thank you, Your Honor. So it's supplemental excerpts of the record. I have them right here. The appendix 843, excuse me, that begins at 843 of the SER is the soils, geology, and groundwater appendix. It describes the erosion effects from all the dams, including the erosion effects at Albany Falls. Programmatic EIS. That's correct, Your Honor. Done in 1995. Correct. Based on the operation that is basically the same operation that is going to be resumed, that has been actually resumed through flexible operations. Now, 1995 is not as far back as 1955, but still a long time ago. Well, it's almost 20 years, isn't it? Yeah. The erosional effects are, again, largely the same as what were occurring. They have not changed. And just as an aside, how do we know that? Because of the conditions. The dam is operating under these flexible operations the same way it was operating then, the same climate. Well, for example, you now have invasive species that you didn't have back then, right? This wandering bush. Right. So things changed in the environment in 20 years. And here's one example. Okay. You stand there and tell me, and you're not a scientist, right? You didn't work on this thing. I mean, maybe you are a scientist. I'm not a scientist, Your Honor. Anyway, today you're a lawyer. Correct. So just if I were to say, gee, I'd like to know why this new species isn't really a problem. You and I agree that this was not a problem 20 years ago, right? The invasive species issue? Yeah. I mean, I'm just giving you that as an example, right? They couldn't have discussed it because it wasn't an issue then. To be honest, I'm not certain if it was then. I know it is an issue now, and our EI thoroughly addresses the invasive species issue as well. Okay. So I'll give you a choice. Tell me where it is discussed in the program at EIS. Or if it's not, explain to me why I shouldn't worry about that. If I could just ask to clarify. There's a change of circumstance. I mean, let's say — I mean, I don't know that much about this invasive species, but I assume this is not — when they call it an invasive species, they don't — this is not a compliment. Right. This is a bad thing. And so why should I not worry about the effect of this species? Now, you can't tell me where it is discussed in the program at EIS. And I won't, Your Honor. And even if you go back and find — look for it, you probably won't find it. So let's say you look for it and you can't find it, and I look for it and I can't find it, and even give it to the law clerks and they can't find it. What do I do about this? What do we do about the fact that you've now got this invasive species that couldn't have been or wasn't considered in 1995, and it's now an issue now? How do we know this is not a different problem? I think because if we do look, we will find it in the record. And it's addressed specifically in — I understand. And if we do, then that's a complete answer. But let's say we don't find it. I mean, if we don't, you can't tell me now that it is there. I don't remember seeing it there when I was preparing for the case, but maybe I'm wrong about that. It is actually addressed in our EA at SER 76. You were relying on the programmatic EIS. You were relying on that. So that's where we were in the argument. You're saying you don't need to worry about it because we did this thing 20 years ago. Nothing's changed, so it's still good today. That was your argument. That's what we said. So I said, well, what about this invasive species? It's the best I can tell. It didn't exist 20 years ago. And so you went back and forth as to whether or not we'd find it in the EIS 20 years ago. Let's say we don't find it 20 years ago. Do you have another answer? I do, Your Honor. And that is — the answer is actually more complex than that we simply relied on the programmatic EIS. We actually — that was the whole point of the EA, was to look at current literature, current information for a variety — all the resources that were of concern out there, from erosion to invasive species to wildlife, and make reasoned analysis of potential impacts given the nature, the very limited nature of this action that we're taking. So in some cases, we point to information that's in the EIS. You're doing a lot of talking, but you're really not answering my question. Okay? Where do I find something that will put my mind at ease as to the invasive species, assuming it's not in the programmatic EIS done 20 years ago? Talk to me about — Okay. I would — You don't have to tell me any — just avoid the adjectives and adverbs. Just tell me where it is. Absolutely, Your Honor. I would point to the EA that analyzes this particular impact and explains that the spread of these invasive species is mainly from ice transport. It explains that eight studies have been done that review this, and those were considered in the process of preparing this EA. And it also explains that a variety of measures, such as the limited ramping rates, which is the amount that the lake might be moved up or down at any particular given time, best management practices, and the actual limits on overall lake changes serve to mitigate the potential spread and contribution of the flexible operations to any impacts that may be ongoing at the lake as a result of these invasive species, which are being addressed through other mechanisms at the lake on a broader, more holistic basis. But you said there were studies done since then — Correct, Your Honor. — that the EA relied on. Those are cited, too, on pages, I believe, 149 through 150 of the EA, as well as 76. Okay. Do you know where the excerpt of that is? I'm sorry. Maybe I can just find it. And which pages did you say? Let me look again, Your Honor. I've got the EA. I've got the EA here. Which pages of the EA are you talking about? There are — it's actually — let me — there's the impact analysis is on SER 75. The studies are more thoroughly discussed — You switched — The studies are more thoroughly discussed on SER 40. That's where the — No, no, no. You're not giving me pages in the EA. You're giving me pages in the SER. SER 40, yes, Your Honor. And does that correspond to pages of the assessment itself? Yes. Page 3-20 of the EA talks about flowering rush. Okay. Hold on a sec. 3-20. Yes, Your Honor. Let me get to it. Well, never mind. Let me go to — so I'm sorry. Which page of the SER did you say? Page 40 of the SER, page 3-20 of the EA, Your Honor. So this would be volume one of the — Yes, Your Honor. SER. Supplemental excerpts, volume two. There we go. I'm sorry. So what page of the SER again? SER 40. 40. Okay. I'm getting there. And what do I find when I get to 40? You find the studies that were reviewed that you were asking about, Your Honor. The whole study, Eckert, Parkinson, Delisle. Also on page SER 41, DuPont and Bennett. Madison and Wursel. Goldsby. Okay. So all those serve to provide additional information related to invasive species that Bonneville reasonably relied on in preparing the EA to consider the potential for impact and the potential for this operation's contribution. Are there similar studies for erosion? Your Honor, there are a number of studies as well for erosion that updated and provided more current information to in fact confirm what was in the SOR EIS. Those can be found in the record on pages largely at SER 32-33. These are the studies that, for example, explain that on page SER 33, the majority of shoreline erosion downstream of Albany Falls Dam is a result of high flows during spring runoff events. And also refer to the recreational use boat wakes as well as wind generator waves are the primary factor in contributing to erosion at Albany Falls. Those happen in summer. There's also spring freeze-thaw cycles as well as runoff events that are primarily the erosive factors at Albany Falls. Okay. In understanding the impacts of this operation, and I think this is important, it was asked about earlier about the actual implementation. I believe Judge Davis asked about how frequently this would be implemented. The EA does analyze a three-cycle scenario as a sort of worst-case scenario for this analysis to show the high end of potential impacts. And even with that analysis, it was shown that these were not going to be significant impacts. But I think it's very important to understand that, and this was explained in the EA, that this type of operation, practically speaking, is not going to be happening. There are several factors that must perfectly align in order for Bonneville to even consider using this wintertime flexibility. There must be an actual inflow into the lake that can be stored. There must be a projected need for the power, which would justify storing it in the first place. There must be actually an expectation that we'll be able to store when power values are low and release when they're high so that it makes financial sense. And it must be in a year when the technical management team, which is an organization of federal and state agencies, tribes and others, each year they set a minimum wintertime lake elevation level. When they set it at the lowest level, which is 2,051 feet above mean sea level, or 2,051, that's the time when Bonneville can actually utilize the flexibility. However, they explain in the EA that this lake level is either set at that level or at 2,055, and that typically alternates year to year. So in 2,055 years, if you will, there's no capacity for Bonneville to use this operation at all because the upper bound of it is 2,056. So you've got a very teeny amount of variability available to us. So in reality, there will be many years where the flexibility is not used at all, other years where it might be used only once or twice, and even when it is used, it might be used on a very sporadic basis. It's in many ways no different than having a rainy day fund, or actually not even having funds in that, but the availability of a rainy day fund or a home equity line of credit where in an emergency you can draw on it, but you may not use it, and conditions have to be just right for you to be able to use it. I'm sorry, do I understand you to say that the level can't fall below 2,055? So in certain years, this operation would be highly constrained, and yes. In some years, if the technical management team sets the wintertime minimum lake level at 2,055, there's no way we can draw below that. The whole point of this is it is extremely bound by all these operational and environmental constraints that are already in place at the lake. Yes or no answer would have helped me more. Thank you. You've added a lot of words which just confuse me. Can I say yes sometimes? Sounds like no to me. Yes when the lake level is set at that level. So no, the answer is no. Is it always at 2,055? Yes, it's a simple question. I know the more you sort of don't want to give me the answer, the more it emphasizes to me that it's not what you said. So why talk about 2,055 if, in fact, they can go below that? Because they typically alternate the lake levels each year between setting at 2,051, 2,055 for fish protection purposes primarily, kokanee spawning. If they set it at the higher level, if the Corps sets it at the higher level based on the recommendation of all these regional entities, that's the level that we're stuck with, and that will be what we get. This is completely an opportunistic type of operation that is only what we can eke out when all these other things are in place. We come last, essentially. All these other measures, protective measures, come first. So in some years it will be set at 2,055, and that's the minimum. I'm just not understanding the point of what you're saying. If the thing never happens, then you don't need it. Don't worry about it. The point is that you want it because some years it will happen. Correct. And those are the years we worry about. Those are the years, you know, the years it doesn't happen, we don't have to worry about those. So telling us that some years it won't happen or many years it won't happen or, you know, all that, how does that help you any? I think because, Your Honor, it's a reality check on actually how this is going to be implemented. It won't be as dramatic or as overbearing as the petitioner may portray. It will just be this opportunistic type of operation that's implemented sporadically and yields to many other operations at the lake. And I think all that is to say, Your Honor, is that given that nature of this type of operation, that what BPA did here was very reasonable, was a reasonably hard look given the circumstances, and complied with NEPA. Okay. Thank you. You're out of time. Oh, all right. Thank you, Your Honor. Thank you, Your Honors. First, I'd just like to say that BPA's proposal is to fluctuate the lake levels up to three times every winter over that five-foot range. That's what they propose. That's what they need to evaluate. And the key problem here is that they've never studied shoreline erosion and what will happen under different operations at the dam. They didn't do that here. SCR 32, where they talk about shoreline erosion, and the opposing counsel said there were studies cited. And then I asked him about an invasive species, and he gave me some studies there as well. Right. Why aren't those sufficient? Yeah, the studies in the record on erosion, they say absolutely nothing about what to expect with these new winter fluctuations. Those were studies that were evaluating ongoing erosion at certain locations under the existing operations where winter lake levels are steady. They didn't model what would happen in the future. They didn't evaluate what would happen if we were to change the operations in some way. They said under current operations, here's what's going on in this particular part of the lake. And so those just don't tell you what to expect under the winter operations. Do you think the agency can extrapolate from existing conditions? Yeah, that would be reasonable if they were to have done that here. They didn't do that. All they said was these studies show that the summer lake levels, which are really high, are causing a lot of erosion right now. I don't know. They didn't bring their expertise to bear and try to actually extrapolate how that said something about these new winter fluctuations. Are they equating incremental with insignificant? That's a good question, Your Honor. I think so. I think they're saying any change is going to be incremental, correct? Right. I'm not sure how that tells us whether it's significant or substantial. Right. I agree. And I think the reason they use incremental is because they're starting from the 1995 EIS and saying we looked at this here and this will just be incremental to that. The problem is they didn't really look at it there. There's some general information that maybe around the whole lake, 30 acres are eroding away every single year. But it's not clear what specific operations those 30 acres are eroding away under, and they fail to explain how increased erosion would be just incremental. Like how much do they expect it to be? They don't know. And that's what we're asking them to do here is to actually look at it and figure it out. And in those two paragraphs that I pointed out in my opening argument, they say we don't know the magnitude of the increase in erosion that would require going out and surveying the shoreline. And as Your Honor correctly noted, the impacts vary a lot depending on the type of substance on the shoreline and how steep it is. And Lake Pend Oreille is a huge lake. There's 226 miles of shoreline above the dam. Parts of it are steep mountains that drop off right into the lake. Parts are relatively flat, and the soil is very hot. And so until BPA actually looks at those things, they don't know what's going to happen under the winter fluctuations. And with flowering rush, the- Well, didn't they say something like we don't, or maybe they did, we don't know precisely what would happen, but we know it's going to be very minor compared to what's going on now. Wasn't that their point? They say incremental, and they said, but it's not much. Right. That's what they say. That's what they say. And what's that based on, I'm not sure. And that's why I pointed out those two key paragraphs in the EA. I guess I'd like to follow that up with quoting from Idaho Fish and Game's public comments. When the draft environmental assessment came out, Idaho Fish and Game is the agency that's actually been doing on-the-ground monitoring of erosion, said, quote, this is ER 149. We concur with the draft EA that summertime wave action is a major cause of erosion of valuable wildlife habitat, but we believe our empirical observations make it clear that winter erosion is substantial and significant, and that the evidence strongly points to significant exacerbation of the problem with the proposed change in operations, end quote. And, you know, the point of this case isn't whether Idaho Fish and Game is right or not, but the point is, did EPA have any reasonable basis for reaching completely the opposite conclusion? Thank you, Your Honors. Okay. Thank you. The case is argued and submitted. We'll adjourn. Thank you.
judges: Davis, Kozinski, Fernandez